IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:25-cr-00245-IM |
| v. | **OPINION & ORDER DENYING MOTION TO SUPPRESS** |
| **JOSE IVAN IRIBE CAMORLINGA**, | |
| Defendant. | |

Paul T. Maloney, Assistant United States Attorney, and Scott E. Bradford, United States Attorney, 1000 SW Third Avenue, Suite 600, Portland, OR 97204.

Robert Hamilton, Federal Public Defender, 101 SW Main St., Ste. 1700, Portland, OR 97204. Attorney for Defendant.

**IMMERGUT, District Judge.**

Before this Court is Defendant Jose Ivan Iribe Camorlinga ("Defendant")'s Motion to Suppress ("Mot."), ECF 24. Defendant seeks to suppress twenty-five kilograms of fentanyl found in his vehicle and other evidence obtained during a traffic stop. Mot., ECF 24 at 6. Defendant argues that the state trooper extended the traffic stop to investigate drug activity without reasonable suspicion, that the state trooper effectively arrested Defendant without probable cause, and that Defendant's consent to the search of his car was involuntary. *Id.* at 7.

The Government opposes the motion. Government's Response to Defendant's Motion to Suppress ("Resp."), ECF 26. This Court held an evidentiary hearing on January 28, 2026, and heard oral argument. This Court heard testimony from the state trooper, Scott Show, and received exhibits in evidence, including Trooper Show's body-worn camera and dashboard camera video footage. For the reasons explained below, this Court DENIES Defendant's Motion.

## BACKGROUND

The pertinent facts are as follows. Just before 2:00 p.m. on May 20, 2025, Trooper Scott Show, an Oregon State Police trooper and DEA task force officer[1], observed Defendant's car driving northbound on I-5 near Brownsville, Oregon. 1/28/2026 Tr. 43:1–22. Trooper Show, based on his extensive training and experience, was aware that the I-5 corridor, which runs from Mexico to Canada, is recognized as a "high intensity drug trafficking area" by the federal government. *Id.* at 32:23–33:7. Trooper Show noticed that Defendant's car was traveling below the speed limit when it passed Trooper Show's marked Oregon State Police patrol vehicle, which was parked in the median of the interstate. *Id.* at 43:2–22, 44:2–12. Trooper Show also noticed that Defendant's car was old, a 2014 model, but it had a new California license plate.[2] *Id.* This was significant to Trooper Show because of his specialized training as a narcotics interdictor. *Id.* at 30:8–11. Trooper Show knew that narcotics traffickers frequently change the plates of their

---

[1] At the time of the relevant traffic stop, Trooper Show had over 17 years of experience as an Oregon State Police trooper. 1/28/2026 Tr. 16:18–19. Trooper Show has attended and developed extensive training curricula on "cold stop interdiction," which involves seizing bulk narcotics during a cold traffic stop. *Id.* at 15:22–16:17. This Court found Trooper Show's testimony credible and that his conclusions about Defendant's drug trafficking behavior were well-supported by Trooper Show's specialized experience and training.

[2] Trooper Show testified that he recognized that Defendant's license plate was new because the license plate number began with 9L. 1/28/2026 Tr. 43:20–22. California sequentially numbers its plates, so Trooper Show can tell when a vehicle has a new California plate by the first two characters of the plate's number. *Id.* at 43:23–44:1.

vehicles as a countermeasure against long-term investigations from authorities. *Id.* at 30:25–31:20. In fact, Trooper Show often searches for bulk drug traffickers by looking for newly registered, older vehicles in the slow lane going below the speed limit. *Id.* at 34:20–25. So, Trooper Show entered I-5 and began to follow Defendant. *Id.* at 44:13–16.

While following Defendant, Trooper Show noticed that Defendant changed from the slow lane to the fast lane without signaling, which violated the Oregon Vehicle Code. *Id.* at 46:23–47:22.[3] Once Trooper Show was directly behind Defendant, he began to query Defendant's plate. *Id.* at 48:13–24. Then, he turned on his emergency lights and pulled Defendant over. *Id.* at 48:25–49:12. Within seconds, Trooper Show exited his vehicle and walked towards Defendant's passenger side window. Def. Ex. 1 at 1:25–35. Trooper Show did not draw a weapon or display a weapon as he approached. *Id.*

At Defendant's passenger window, Trooper Show smelled a "masking agent"—in this case, an air freshener. 1/28/2026 Tr. 51:25–52:1, 110:13–19. Masking agents are often present with drug traffickers since they may affect a canine's ability to detect drugs. *Id.* at 42:12–22. Trooper Show noticed that Defendant used his left hand to steady his right hand as he began to speak to Defendant. *Id.* at 52:3–14; Def. Ex. 1 at 00:35–40. Defendant was wringing his hands while Trooper Show informed him of the reason for the stop, Def. Ex. 1 at 00:34–1:10, and requested Defendant's license and registration. *Id.* at 1:15–1:45. Defendant handed over his Mexican driver's license and his California registration, which showed Defendant's name with

---

[3] Trooper Show testified that the un-signaled lane change was indicative that Defendant was not aware of Trooper Show's presence. 1/28/2026 Tr. 47:16–22. In Trooper Show's view, Defendant later noticed Trooper Show, so he signaled to get back into the slow lane and reduce his speed. *Id.* at 47:9–13. Trooper Show testified that changing speeds and lanes in response to police presence demonstrated that Defendant was driving in a manner to avoid police contact. *Id.* at 83:13–21.

an address in Oakland, California. *Id.*; Gov't Exs. 3–4. Although Defendant spoke with a Spanish accent, Trooper Show was able to communicate effectively with Defendant and Defendant responded appropriately. Def. Ex. 1 at 1:35–2:42. Trooper Show then noticed an open phone line on one of Defendant's two phones, which were visible to the trooper from the open front passenger window. 1/28/2026 Tr. at 59:9–15; Def. Ex. 1 at 0:27–40. One phone was in the console cupholder, and the other was on the dashboard. Gov't Ex. 5. However, Trooper Show observed that Defendant was not talking to the person on the line, and Trooper Show heard no one on the line. 1/28/2026 Tr. at 59:13–15, 62:6–9. Trooper Show knew that drug traffickers sometimes make either silent or oddly timed phone calls to notify someone in their trafficking organization that they have been stopped by the police. *Id.* at 62:10–63:13. Trooper Show then asked Defendant if he was on the phone, Def. Ex. 1 at 2:42, but Defendant did not audibly respond. Trooper Show asked Defendant who owned the car and about the origin, destination, and purpose of Defendant's trip. *Id.* at 1:46–4:10. Defendant told Trooper Show that he owns the car, that he is traveling from Tijuana to Salem, and that he is traveling to visit a friend for one day. *Id.* Trooper Show then returned to his patrol vehicle to run Defendant's information. *Id.* at 4:05–10:00.

Back at the patrol vehicle, Trooper Show contacted his analyst who had been monitoring the stop remotely. 1/28/2026 Tr. at 56:24–57:4, 64:5–12. That analyst identified that Defendant's vehicle, according to its license plate, was the subject of a then-current DEA drug investigation out of Oakland, California. *Id.* at 67:19–23. Trooper Show testified that this identification is "rare," and precisely why drug traffickers frequently change plates. *Id.* at 67:24–25. Trooper Show testified that he understood this identification to mean that Defendant's vehicle "is a drug smuggling car" that the DEA was investigating. *Id.* at 68:1–10. At this point, Trooper Show

believed there was a fair probability that Defendant's car contained drugs or evidence of

narcotics trafficking. *Id.* at 69:4–9. Trooper Show checked Defendant's license plate and

determined that the vehicle had never crossed in or out of the United States with its current plate.

*Id.* at 65:7–14. Trooper Show queried Defendant's registration and learned that the vehicle was

totaled and reconstructed in Guadalajara, Mexico before it was issued a salvage registration in

Oakland, California. *Id.* at 65:5–16. Trooper Show testified that Oakland is a hub of fentanyl

distribution into Oregon and that drug traffickers commonly use vehicles with salvaged titles that

were rebuilt down in Mexico. *Id.* at 35:16, 65:17–22. Trooper Show called this practice a

"Mexican title flip." *Id.* at 65:17–22.

      With this information, Trooper Show returned to the passenger side window of

Defendant's car. Def. Ex. 1 at 9:50–10:03. Trooper Show asked Defendant "Would it be okay if

you talked with me back at my patrol car? I just have some questions for you and it's easier if we

do it back there. Would that be okay with you?" *Id.* at 10:04–10:10. Trooper Show testified that

it would be easier to speak to Defendant in the patrol vehicle due to the noise of the highway

traffic. 1/28/2026 Tr. 23:12–21, 70:2–12. Trooper Show also could easily connect with a

translator if needed in his vehicle via CarPlay. *Id.* at 24:17–25. Defendant exited his car and

began walking towards the passenger side of the patrol vehicle. Def. Ex. 1 at 10:20–36. Trooper

Show opened the passenger door and asked Defendant "Do you carry guns?" *Id.* at 10:36–38.

Defendant responded no. *Id.* Trooper Show did not pat defendant down. *Id.* Trooper Show had

no guns drawn. *Id.* at 10:20–40. Trooper Show opened the front passenger door and asked

Defendant to take a seat. *Id.* at 10:38–40. Trooper Show walked back to the driver's side to sit in

the driver's seat. *Id.* at 10:40–45. Defendant got in and closed the passenger door. *Id.* at 10:45–

10:55. Trooper Show did not lock the doors. *Id.*; 1/28/2026 Tr. 72:20–22.

Trooper Show and Defendant spoke for approximately thirteen minutes before contacting a translator. Def. Ex. 1 at 10:55–24:00. Defendant conveyed that he did not speak English well to Trooper Show. *Id.* at 10:55–11:05. But Trooper Show did not find the language barrier to be prohibitive. 1/28/2026 Tr. 76:7–12. Defendant's answers were responsive to Trooper Show's questions, and Defendant asked for clarification when he did not understand. Def. Ex. 1 at 10:55–24:00. Defendant told Trooper Show that he crossed the border in December and that he is coming from Modesto today to visit the shopping mall outlets in Salem. *Id.* at 11:20–12:40. Trooper Show asked where Defendant lives. *Id.* at 13:05–10. Defendant said that he stays with friends in Oakland, Modesto, and Merced. *Id.* at 13:10–20. Defendant said that the address on his car's registration is his friend's. *Id.* at 13:20–28. Trooper Show asked the name of the friend, and Defendant replied "Francisco". *Id.* at 13:28–13:30. Trooper Show asked if Defendant knew the friend's last name. *Id.* at 13:30–33. Defendant paused and then said "honestly, no." *Id.* at 13:34–45. Responding to Trooper Show's questions, Defendant stated that he is an emergency doctor and that he does not have friends in Salem. *Id.* at 14:20–16:17. When Trooper Show sought to clarify if Defendant was traveling from Modesto to Salem to "buy clothes," Defendant responded that his friends say Oregon is a nice place with lakes and trees, different from California. *Id.* at 16:53–17:40. But then Defendant confirmed he would not be seeing any lakes or trees. *Id.* at 17:41–50. Trooper Show asked for Defendant's phone number. *Id.* at 17:52–55. Defendant provided two phone numbers: one American phone number for the car and one Mexican phone number. *Id.* at 17:55–19:52. Trooper Show and Defendant then discussed how long Defendant had owned the car and the repairs done to salvage the vehicle. *Id.* at 19:53–22:28.

After about twelve minutes, Trooper Show began to question Defendant about what is in the car. *Id.* at 22:29. Defendant confirmed that everything in the car was his and that there were

no drugs in the car. *Id.* at 22:55–23:37. Trooper Show asked for consent to search the car. *Id.* at 23:40–50. Defendant asked him to repeat himself. *Id.* at 23:51–54. Trooper Show then called a translator, noting "This is important." *Id.* at 23:55–24:00.

 Within a minute, Trooper Show connected with a translator on the phone. *Id.* at 24:00– 42. The translator identified himself as police and told Defendant in Spanish that Trooper Show specializes in investigating narcotics with the DEA.[4] *Id.* at 25:30–25:55. Trooper Show told the translator that he believes there are narcotics in the vehicle. *Id.* at 26:38–40. Trooper Show asked the translator "Will you . . . tell him it's not required to consent to a search but ask him if he would let me search his vehicle to make sure there's no drugs in there." *Id.* at 26:42–52. The translator told Defendant, in Spanish, "He wants you to know it is not required to give consent to a review, but he wants to review the car. Is that all right with you?" *Id.* at 26:53–27:04.[5] Defendant asked, in Spanish, why the search? *Id.* at 27:05–34. The translator replied, in Spanish, "He says that to be sure that there aren't any drugs or illegal things in the car. If he doesn't find anything, you would be free to go." *Id.* at 27:35–45. Defendant asked, "And if I said no?" in Spanish. *Id.* at 27:46–48. Trooper Show told the translator that if Defendant said no, he would

---

[4] Defendant provided a translation of the Spanish spoken in the body-worn camera audio, to which the government did not object. Def. Ex. 102. The translation shows that the translator's Spanish translation was not perfect, but it was clear from the body-worn camera video that Defendant understood the meaning and was not confused by the translator's statements. *See* Def. Ex. 102 at 16–24 (identifying incorrect words like "consento" in quotes). Defendant spoke English with a level of proficiency that allowed him to clearly communicate with Trooper Show. Defendant frequently responded with uh-huh or okay to acknowledge he understood the translator. Def. Ex. 1 at 25:49–52; 27:45; 28:54–29:02. Defendant did not ask for clarification when the minor translation errors were made, and he appeared to understand the translator because his responses and questions in Spanish were responsive to what the translator said. *Id.* at 24:00-33:00.

[5] Defendant's exact translation is "Okay, He wants you to 'sepes' that it's not required for to (sic) give 'consento' to a, uh, review, but he would like to do a review of the car. Is that all right with you?" Def. Ex. 102 at 18.

deploy his drug dog and probably apply for a search warrant. *Id.* at 28:05–28:35. The translator

told Defendant this in Spanish. *Id.* at 28:35–29:02. Defendant replied "yes, it's fine" in Spanish.

*Id.* at 29:03–04. Trooper Show asked Defendant "It's okay if I search" in English and Defendant

said "yes, it's fine" again in Spanish. *Id.* at 29:06–09. The translator confirmed Defendant's

consent to search the car once more in Spanish, and Defendant agreed. *Id.* at 29:12–16.

     After Defendant consented, Trooper Show asked, via translator, if Defendant will be

honest about what is in the car because fentanyl is very dangerous. *Id.* at 29:18–47. Defendant

denied having fentanyl. *Id.* at 29:47–53. Trooper Show stated that he believes there are kilos in

the car and that Defendant does not know what they are. *Id.* at 30:15–24. The translator told

Defendant this in Spanish. *Id.* at 30:24–30. Defendant said, in Spanish, "Honestly I do not know

what it is." *Id.* at 30:31–48. The translator then read Defendant his *Miranda* rights in Spanish. *Id.*

at 31:30–33:00. Trooper Show pointed at the passenger door and told Defendant he could exit

the vehicle. *Id.* at 33:20–33:25. Defendant exited the vehicle and began to walk towards his car.

*Id.* at 33:26–33:38. Trooper Show directed Defendant to stand further back with a backup

officer, who had arrived and was parked behind Trooper Show's car. *Id.* at 33:38–50. Defendant

was not handcuffed nor were any guns drawn. *Id.* Trooper Show deployed his narcotics detection

dog around Defendant's car. *Id.* at 34:00–36:20. The dog did not alert. *Id.*; 1/28/2026 Tr. 99:7–

8.[6] Trooper Show then searched Defendant's car and found 25 one-kilogram packages in

---

[6] Trooper Show testified many things can cause a non-alert, including the lack of odor, the
failure to hunt for odor, or an overwhelming presence of odor. 1/28/2026 Tr. at 41:12–25. A
non-alert is not conclusive that drugs are not present. *Id.* at 41:9–11. Trooper Show testified that
his narcotics detection dog on the day at issue had very little exposure to exterior vehicle
deployments on I-5. *Id.* at 99:9–23. The dog was not meaningfully sniffing the car due to the
traffic, wind, smells and distractions on I-5. *Id.* at 99:24–100:2.

PAGE 8 – OPINION & ORDER DENYING MOTION TO SUPPRESS

Defendant's trunk. Def. Ex. 1 at 36:45–38:30; Gov't Ex. 12. Defendant was then cuffed and placed in the back of a patrol vehicle. Def. Ex. 1 at 39:00–40:40.

## STANDARDS

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. "When evidence is obtained in violation of the Fourth Amendment, the judicially developed exclusionary rule usually precludes its use in a criminal proceeding against the victim of the illegal search and seizure." *Illinois v. Krull*, 480 U.S. 340, 347 (1987). The government bears the burden of establishing that a warrantless search or seizure was reasonable. *United States v. Hawkins*, 249 F.3d 867, 872 (9th Cir. 2001).

Officers need reasonable suspicion to stop an individual. *Terry v. Ohio*, 392 U.S. 1 (1968). A temporary *Terry* stop can become a de facto arrest, which requires probable cause, if the stop is sufficiently prolonged or if the methods employed are too intrusive. *Florida v. Royer*, 460 U.S. 491, 500 (1983). Officers "may search a car when they are given voluntary, unequivocal, and specific consent." *United States v. Taylor*, 60 F.4th 1233, 1243 (9th Cir. 2023) (quoting *United States v. Basher*, 629 F.3d 1161, 1167–68 (9th Cir. 2011)) (citation modified). Without consent, officers can conduct a warrantless search of a vehicle if they have probable cause to believe the vehicle contains evidence of a crime. *United States v. Steinman*, 159 F.4th 550, 568 (9th Cir. 2025) (describing the "automobile exception" to the Fourth Amendment's warrant requirement).

## DISCUSSION

Trooper Show's stop comported with the Fourth Amendment. Defendant does not dispute that Trooper Show had probable cause to stop him when Trooper Show witnessed Defendant change lanes without signaling. *See generally* Mot., ECF 24. Trooper Show lawfully extended

the traffic stop based on reasonable suspicion that Defendant was trafficking drugs, particularly due to on an ongoing DEA investigation into Defendant's vehicle. Trooper Show then developed probable cause of drug trafficking based on several indicia of bulk drug smuggling that Trooper Show identified, including Defendant's inconsistent answers during their conversation. Based on that probable cause, Trooper Show lawfully searched Defendant's vehicle pursuant to the automobile exception to the Fourth Amendment's warrant requirement. Additionally, Defendant voluntarily and unequivocally consented to the search of his car and the consent was not the fruit of any Fourth Amendment violation. For those reasons, as explained in detail below, Defendant's request to suppress evidence gathered during the traffic stop is denied.

## A. Extending the Traffic Stop

A traffic stop is "more analogous to a so-called *Terry* stop than to a formal arrest." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (citation modified). The tolerable duration of a traffic stop is determined by its mission—to address the violation that warranted the stop and attend to any related safety concerns. *Id.* "Lawful inquiries incident to a traffic stop can include checking a driver's license, determining whether there are outstanding warrants, and inspecting the automobile's registration and proof of insurance." *United States v. Steinman*, 159 F.4th 550, 561 (9th Cir. 2025). Questioning about travel plans, "generally falls within the purview of the traffic-stop mission." *Id.* at 563. An officer may extend a traffic stop to investigate matters other than the original traffic violation so long as he has reasonable suspicion of an independent offense. *United States v. Landeros*, 913 F.3d 862, 867 (9th Cir. 2019). Reasonable suspicion requires "a minimal level of objective justification" that is "more than an 'inchoate and unparticularized suspicion or "hunch"' of criminal activity." *Illinois v. Wardlow*, 528 U.S. 119, 123–24 (2000) (quoting *Terry v. Ohio*, 329 U.S. 1, 27 (1968)).

Trooper Show did not extend the traffic stop within the first ten minutes. Trooper Show spent less than four minutes at Defendant's vehicle. Def. Ex. 1 at 00:30–4:10. Trooper Show informed Defendant of the reason for the stop. *Id.* at 00:34–1:10. He requested Defendant's license and registration. *Id.* at 1:15–1:45. He asked Defendant who owned the car, and he asked about the origin, destination, and purpose of Defendant's trip. *Id.* at 1:46–4:10. Trooper Show then returned to his patrol vehicle for approximately six more minutes to run Defendant's information. *Id.* at 4:10–9:55. Trooper Show queried the registration and searched for recent border crossings to corroborate Defendant's statements. 1/28/2026 Tr. 64:8–65:14.[7] Trooper Show also spoke with his team's analyst, who matched the vehicle's plate to an ongoing DEA investigation out of Oakland. *Id.* at 64:10–12, 67:19–23. This Court is persuaded that these activities are firmly within the mission of the traffic stop under *Steinman*, 159 F.4th at 561, 563 (noting that checking driver's licenses, inspecting registrations, and inquiring about travel plans all generally fall "within the purview of the traffic-stop mission").

Even assuming that Trooper Show extended the traffic stop after the first ten minutes, that extension was justified by Trooper Show's reasonable suspicion of Defendant's drug trafficking. Trooper Show had reasonable suspicion based on several facts, which this Court identifies in three parts. First, Trooper Show knew that Defendant's vehicle was the subject of a 2025 DEA fentanyl sales investigation out of Oakland, California. 1/28/2026 Tr. 67:21–69:9. Second, Defendant's car was old, but it was recently registered with new plates pursuant to a "Mexican title flip." *Id.* at 65:17. That is, a vehicle totaled in the United States is rebuilt far away in Mexico before reappearing back in the States. *Id.* at 65:18–22 Trooper Show testified that a

---

[7] Trooper Show's body-worn camera was muted for the six minutes he was in his patrol vehicle alone. *See* Def. Ex. 1 at 4:15–9:55. This Court finds Trooper Show's testimony about what occurred during this time to be credible.

Mexican title flip is a very common tactic of drug traffickers. *Id.* at 65:17–18. The fact that the registration was less than six months old, also raised Trooper Show's suspicion given that traffickers frequently change license plates to avoid any records tying the vehicle's plate to drug smuggling investigations. *Id.* at 30:25–31:15, 107:19–109:1.

Third, there were several indicia, based on Trooper Show's extensive training and experience, that the vehicle was currently trafficking drugs. These indicia included the use of masking agents, the driver's nervousness and wringing hands, the silent phone call, and the fact Defendant was driving north on I-5, a high-intensity drug trafficking area from California, for a one-day trip to Salem, Oregon. *Id.* at 32:23–33:7, 62:3–63:13, 83:13–86:7. This activity could have an "innocent explanation," but this Court "need not rule out the possibility of innocent conduct" to find "that reasonable suspicion exists." *United States v. Arvizu*, 534 U.S. 266, 277 (2002). The above facts, taken in light of Trooper Show's experience and specialized training, provide "a minimum level of objective justification" for Trooper Show to stop and question Defendant about suspected drug trafficking. *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).

## B.  De Facto Arrest

"There is 'no bright-line for determining when an investigatory stop crosses the line and becomes an arrest.'" *United States v. Torres-Sanchez*, 83 F.3d 1123, 1127 (9th Cir. 1996) (quoting *United States v. Hatfield*, 815 F.2d 1068, 1070 (6th Cir. 1987)). With "reasonable justification," detention in a patrol vehicle does not exceed permissible *Terry* limits. *United States v. Ricardo D*, 912 F.2d 337, 341 (9th Cir. 1990). A request from an officer to sit in the patrol vehicle, rather than an order, weighs in favor of the detention constituting a *Terry* stop instead of an arrest. *Torres-Sanchez*, 83 F.3d at 1128 (holding that detention in patrol car was a *Terry* stop in part because the defendant "voluntarily entered the patrol car" and "was never required" to do so).

PAGE 12 – OPINION & ORDER DENYING MOTION TO SUPPRESS

Trooper Show's request to Defendant to speak in the patrol vehicle was not a de facto arrest. "[T]here is no per se rule that detention in a patrol car constitutes an arrest." *Torres-Sanchez*, 83 F.3d at 1127 (quoting *United States v. Parr,* 843 F.2d 1228, 1230 (9th Cir.1988)). The surrounding context of Defendant entering the patrol vehicle demonstrates that the detention was more like a *Terry* stop than an arrest. Trooper Show requested that Defendant sit in the patrol vehicle. Def. Ex. 1 at 9:50–10:12. He did not order Defendant into the patrol vehicle. *Id.* This request was reasonable given the noise from the highway. 1/28/2026 Tr. 23:12–21, 70:2–12. Trooper Show did not frisk Defendant before opening the passenger door to the patrol vehicle. Def. Ex. 1 at 10:36–38. Defendant entered the vehicle from the passenger side freely and closed the door himself. *Id.* at 10:45–55. The door was never locked. 1/28/2026 Tr. 72:20–22. Trooper Show did not place his hand on his weapon or use any other show of force to detain Defendant in the passenger seat of the patrol vehicle. Def. Ex. 1 at 9:50–10:55. Under these circumstances, this Court is not persuaded that Defendant was under de facto arrest in the patrol vehicle.

If any de facto arrest occurred later in the patrol vehicle, it was supported by probable cause of drug trafficking. Defendant argues that he was under de facto arrest by the time Trooper Show accused Defendant of transporting narcotics by analogizing to *Florida v. Royer*, 460 U.S. 491 (1983). Mot., ECF 24 at 21–22. There, the officers identified themselves as narcotics investigators and told Royer that they had reason to suspect him of transporting drugs. 460 U.S. at 494. The Court reasoned that the officers placed Royer under de facto arrest when they asked him to enter a nearby police room while withholding his ticket and driver's license. *Id.* at 501–02. The Court held that this fifteen-minute seizure in the airport was unconstitutional because it

was not supported by probable cause and that Royer's consent was invalid as the fruit of an illegal detention. *Id.* at 507–08.

Unlike the officers in *Royer*, Trooper Show had probable cause to arrest Defendant for drug trafficking. In *Royer*, the officers observed "a nervous young man with two American Tourister bags" who "paid cash for an airline ticket to a 'target city'" and was flying under an assumed name. *Id.* at 507. Trooper Show observed far more than that. By the time Trooper Show identified himself as a narcotics officer, he had all the information that formed the basis for his reasonable suspicion, *supra*, including the fact that the vehicle was tied to an ongoing 2025 fentanyl sales investigation. Additionally, Trooper Show's conversation with the Defendant only heightened his suspicion.[8] Defendant's car was registered to the address of a friend that Defendant was living with, but Defendant could not recall the last name of that friend. Def. Ex. 1 at 13:20–45. Defendant said he was coming to see friends but then stated that he did not have any friends or family in Salem. *Id.* at 1:46–4:10, 14:20–16:17. Defendant implied he came to Oregon because of the lakes and trees but then confirmed he would not see any lakes. *Id.* at 16:53–50. Defendant instead was making a roughly 1,200-mile road trip to visit an outlet mall for one day. These facts, in connection with the facts that contributed to Trooper Show's reasonable suspicion based on his training and experience, gave Trooper Show probable cause to arrest Defendant for drug trafficking.

---

[8] Defendant argues that his inconsistent statements are the result of a language barrier. 1/28/2026 Tr. 185:1–18. For example, Defendant's later statement that he is coming from Modesto today could be inconsistent with his earlier statement that he is coming from Tijuana. The statements could, however, be consistent if Defendant really meant he *was from* Tijuana. This Court has considered the language barrier but finds that it cannot explain away much of Trooper Show's suspicion. Defendant's answers were responsive to Trooper Show's questions, and Defendant asked for clarification when he did not understand the question. This Court does not find that any inconsistencies—other than Defendant's statement he was coming from Tijuana—were the result of a language barrier.

## C. Automobile Exception

"Under the automobile exception to the warrant requirement, police may conduct a warrantless search of a vehicle if there is probable cause to believe that the vehicle contains evidence of a crime." *United States v. Scott*, 705 F.3d 410, 417 (9th Cir. 2012) (citation omitted). "When a vehicle is being used on the highways . . . the overriding societal interests in effective law enforcement justify an immediate search before the vehicle and its occupants become unavailable" so long as there is probable cause. *California v. Carney*, 471 U.S. 386, 392–93 (1985). The automobile exception includes both the "automobile and the containers within it where they have probable cause to believe contraband or evidence is contained." *California v. Acevedo*, 500 U.S. 565, 580 (1991).

Here, Defendant was driving his vehicle on I-5 immediately before he was pulled over on the side of the highway. Def. Ex. 2 at 0:30–1:30. As described, *supra*, Trooper Show developed probable cause that evidence of drug trafficking would be found in Defendant's vehicle and in the shopping bags within the trunk of Defendant's vehicle. This probable cause developed before Trooper Show searched Defendant's vehicle. Trooper Show's search was therefore lawful under the automobile exception to the warrant requirement

## D. Consent

Officers "may search a car when they are given voluntary, unequivocal, and specific consent." *Taylor*, 60 F.4th at 1243 (quoting *Basher*, 629 F.3d at 1167–68) (citation modified). Unequivocal and specific consent may be express or inferred from conduct like a head nod. *Id.* The voluntariness of consent is a totality-of-the-circumstances inquiry, focusing on five non-exclusive factors:

> (1) whether a defendant was in custody; (2) whether the arresting officers had their guns drawn; (3) whether Miranda warnings were given; (4) whether the defendant

was notified that [he or] she had a right not to consent; and (5) whether the defendant had been told a search warrant could be obtained.

*United States v. Patayan Soriano*, 361 F.3d 494, 502 (9th Cir. 2004) (quoting *United States v. Jones*, 286 F.3d 1146, 1152 (9th Cir. 2002)). Defendant provided unequivocal and specific consent by stating yes in Spanish in response to the question "Is it all right to do a review of the car?" in Spanish. Def. Ex. 102 at 20. Defendant's consent was also voluntary under the totality of the circumstances. Even if Defendant were in custody, Trooper Show never drew his weapon, Def. Ex. 1 at 10:55–29:18, Defendant was told that he had a right not to consent, *id.* at 26:45–27:05. In response, Defendant asked what would happen if he refused to consent, and was properly advised that the officer would apply for a search warrant if he did not consent, *id.* at 28:05–29:00. At all times during the entire stop, Trooper Show spoke in a conversational and respectful tone, never once raising his voice. Although Defendant was not read his *Miranda* rights before giving consent, Defendant does not argue that Trooper Show violated *Miranda*. *See generally* Mot., ECF 24. Defendant was not interrogated in the brief encounter in the vehicle, and, even if Trooper Show had violated *Miranda*, that violation alone does not render Defendant's consent involuntary. *See United States v. Mora-Alcaraz*, 986 F.3d 1151, 1157 (9th Cir. 2021) (holding that a *Miranda* violation did not require the suppression of a firearm if the Defendant's unwarned consent was voluntarily given). Defendant's consent was voluntary because there was no show of force, Defendant was informed of his right to decline the search, and Defendant was seated, by his own volition, in the front passenger seat of an unlocked patrol vehicle. In light of the facts and circumstances presented at the hearing on Defendant's Motion to Suppress, Trooper Show had Defendant's "voluntary, unequivocal, and specific consent" to search Defendant's vehicle.

## CONCLUSION

For the foregoing reasons, Defendant's Motion to Suppress, ECF 24, is DENIED.

**IT IS SO ORDERED.**

DATED this 18th day of February, 2026.

/s/ Karin J. Immergut
Karin J. Immergut
United States District Judge
